UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIAM GARY HURST,
     Petitioner,

v.                             Case No. 8:21-cv-2396-KKM-AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,
     Respondent.
_____

## ORDER

William Gary Hurst, a Florida prisoner, timely[1] filed a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his state-court conviction for first-degree murder. (Doc. 1.) Having considered the petition, (*id.*), the response in opposition, (Doc. 9), and the reply, (Doc. 15), the petition is denied. Because reasonable jurists would not disagree, a certificate of appealability also is not warranted.

## I.   BACKGROUND

### A. Factual Background

This case arises from the murder of Amy Hurst, a crime that went unsolved for nearly thirty years. William Hurst married Amy Hurst in 1975, and the two

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* 28 U.S.C. § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See id.* § 2244(d)(2). The appellate court affirmed Hurst's conviction and sentence on September 12, 2014. (Doc. 9-2, Ex. 45.) His judgment became final 90 days later, on December 11, 2014, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 193 days of untolled time, on June 23, 2015, Hurst filed a petition alleging ineffective assistance of appellate counsel. (Doc. 9-2, Ex. 50.) That petition remained pending—and tolled the limitation period—until it was denied on September 28, 2015. (*Id.*, Ex. 53.) After another eight days of untolled time, on October 7, 2015, Hurst moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex. 60.) That motion remained pending—and the limitation period was paused—until June 16, 2021, when the appellate mandate issued. (*Id.*, Ex. 85.) At that point, Hurst had 164 days—or until November 29, 2021—to seek federal habeas relief. He met the deadline, filing his petition on October 7, 2021. (Doc. 1 at 1.) Therefore, the petition is timely.

lived in Michigan until 1981, when they moved to Pasco County, Florida. (Doc. 9-2, Ex. 34, at 334–35, 594.) The victim stayed in touch with family members in Michigan, including her sisters, her mother, and her two children from a previous marriage. (*Id.* at 336, 341, 346, 371–72.) In August 1982, however, the victim disappeared and was never heard from again. (*Id.* at 336–37.)

On September 5, 1982, fishermen discovered a decomposed body floating in the Gulf of Mexico. (*Id.* at 302.) The body was located approximately 27 miles west of the Manatee County coast. (*Id.* at 303.) It was wrapped in a green bedspread and a multi-colored afghan, and it was secured by a rope tied to a concrete block. (*Id.* at 304.) Medical examiners discovered three blunt force injuries to the top, back, and left side of the head. (*Id.* at 494–96.) The cause of death was determined to be "drowning and blunt force head trauma." (*Id.* at 473.) The body could not be identified, but several physical characteristics were apparent—the victim was a woman in her late 20s or early 30s, about five feet tall, weighing approximately 110 pounds, with brown hair. (*Id.* at 308.)

The body remained unidentified—and the fate of Amy Hurst remained a mystery—for almost three decades. In February 2009, Jeffrey Earley (Amy Hurst's son) visited the Doe Network, a website that collects information about cold cases and unidentified persons. (*Id.* at 372.) While browsing the website, he learned of the body that had been discovered in the Gulf of Mexico in September 1982. (*Id.*) He also viewed photographs of the green bedspread and the afghan. (*Id.*) Earley believed the body might be that of his mother, so he emailed the photograph of the afghan to one of Amy Hurst's sisters. (*Id.* at 355, 372.) She "[i]mmediately" recognized the afghan as one of a set of blankets that her "mother had . . .

2

crocheted" for her and her sisters. (*Id.* at 355.) Through DNA testing and other means, the body was ultimately identified as that of Amy Hurst. (*Id.* at 480–89.)

Law enforcement turned their attention to William Hurst, who was then living in Kentucky. (*Id.* at 518, 520.) A detective visited Hurst's sister and explained that the victim's body had been discovered, that she had been murdered, and that law enforcement "needed to talk to" William Hurst. (*Id.* at 518.) Later that day, Hurst called the detective and claimed that "the last time he saw Amy, [] she had taken off with a blonde girl from the Piggly Wiggly, and that was 30 years ago." (*Id.* at 519.) He also called Elmer Kruse, a friend who lived in the same town in Kentucky. (*Id.* at 540.) Hurst said he "had some very, very bad news," and Kruse agreed to meet him at his house. (*Id.* at 541.)

During the meeting, Hurst told Kruse that his "past ha[d] finally caught up with [him]," and that he was "going to go to prison for the rest of [his] life, if [he didn't] get electrocuted." (*Id.* at 542.) Hurst also said that he "thought [he] got away with it," but "they must have found her body." (*Id.*) He explained that he "got rid of the body the way you're supposed to get rid of a body"—he "wrapped it up in plastic, tied a concrete block around it, and took it out and dropped it in the water." (*Id.* at 543.)

Kruse ultimately agreed to cooperate with law enforcement by wearing a recording device while he spoke to Hurst a second time. (*Id.* at 523.) During this recorded conversation, Hurst said, "[I]f they had any hard evidence, they [would have] arrested me when they came to the door, but they don't. So they had no way of proving that I had anything to do with anything. There's no eyewitnesses, you know, I made sure of that." (*Id.*)

3

Law enforcement also secured the cooperation of Candis Spinks, a friend of Hurst's who was mentioned during the recorded conversation. (*Id.* at 526–29.) Spinks likewise agreed to wear a recording device while she spoke to Hurst. (*Id.* at 528.) He told her that he and the victim had "got[ten] in an argument" one night. (*Id.* at 595.) The victim was lying on a couch, "got pissed off," and stood up to "kick[]" him. (*Id.*) According to Hurst, the victim "missed" and fell, "bust[ing] her head open." (*Id.*) Hurst told Spinks that he "never hit her or nothing." (*Id.*) He also said he "freaked out" and "didn't know what to do" because he "had no insurance" and "didn't have [] funeral coverage." (*Id.* at 596.) Asked what happened next, Hurst said he "got in touch with a couple of friends" who "disposed of the body." (*Id.* at 601.)

The investigation also revealed that Hurst had physically abused the victim during their marriage. Earley, the victim's son, lived with Hurst and the victim for approximately four years in Michigan. (*Id.* at 441–42.) Earley saw Hurst hit the victim "in the shoulder and head area" with an iron skillet. (*Id.* at 444.) On another occasion, Hurst threw the victim down a flight of stairs. (*Id.* at 445.) The third incident took place in a car. (*Id.* at 446.) This time, Hurst "backhanded" the victim in the face, causing her to "bleed[] pretty bad." (*Id.* at 446–47.) In addition, Earley testified at trial that Hurst had threatened to kill the victim. (*Id.* at 448.) On cross-examination, however, Earley was impeached with testimony from a pretrial hearing in which he had denied hearing Hurst make such a threat. (*Id.* at 452.)

As part of the investigation, a medical examiner reviewed the autopsy reports that had been prepared when the victim's body was found in September 1982. (*Id.* at 489–92.) The medical examiner opined that the cause of death was

"unspecified homicidal violence." (*Id.* at 499.) In his view, the three injuries to the top, back, and left side of the head could not have resulted from "someone fall[ing] and hit[ting] their head." (*Id.* at 497.) He also found no evidence that the victim's death was "accidental." (*Id.* at 501.)

### B. Procedural History

Hurst was ultimately charged with one count of first-degree murder, (*id.*, Ex. 2), and a jury found Hurst guilty, (*id.*, Ex. 35). The trial court sentenced him to life in prison, and his conviction was affirmed on direct appeal. (*Id.*, Exs. 37, 45.) Hurst subsequently sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Exs. 60, 63.) One of his claims was summarily denied; the remainder were rejected after an evidentiary hearing. (*Id.*, Exs. 64, 69, 70–71, 75.) The appellate court affirmed the denial of relief in an unelaborated opinion. (*Id.*, Ex. 82.) Hurst separately filed a petition alleging ineffective assistance of appellate counsel. (*Id.*, Ex. 50.) The appellate court denied relief in an unexplained decision. (*Id.*, Ex. 53.) This federal habeas petition followed. (Doc. 1.)

## II.   <u>STANDARD OF REVIEW UNDER SECTION 2254</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable

application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id*. (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies

8

this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

Hurst brings claims for ineffective assistance of trial counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was

reasonable considering all the circumstances." *Id*. at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id*. at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.   <u>ANALYSIS</u>

### A. Ground One—Jury Instructions

Hurst contends that the trial court violated his right to due process by allegedly failing to provide "complete and accurate jury instructions." (Doc. 1 at 5.) According to Hurst, the court neglected to instruct the jury on (1) the elements of first-degree murder, (2) the "definitions of justifiable or excusable homicide," (3) the "definition of premeditation," (4) the "credibility of [Hurst's] out-of-court statements," and (5) the "credibility of [the] state's witness[es]." (*Id.*) Hurst also argues that the court mistakenly instructed the jury that "voluntary intoxication was not a valid defense." (*Id.*)

Respondent is correct that this claim is procedurally defaulted because Hurst failed to fairly present it on direct appeal. (Doc. 9 at 19–20.) In his appellate briefs, Hurst challenged the alleged instructional errors, but he did not "make the state [appellate] court aware that the claim" raised "federal constitutional issues." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007). The relevant portions of his briefs contained no reference to the United States Constitution or any other source of federal law. (Doc. 9-2, Ex. 42, at 14–15; Doc. 9-2, Ex. 44, at 1–4.) Nor did Hurst "label[] the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Instead, he relied entirely on Florida caselaw and statutes to support his argument that the jury instructions were erroneous. (Doc. 9-2, Ex. 42, at 14–15; Doc. 9-2, Ex. 44, at 1–4.)

As a result, Hurst did not fairly present Ground One to the appellate court. He cannot return to state court to present the claim in a second direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within 30 days of the rendition of sentence). Despite this failure, the claim is technically

exhausted. State-court remedies are exhausted "when they are no longer available, regardless of the reason for the unavailability." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022) (quoting *Woodford v. Ngo*, 548 U.S. 81, 92–93 (2006)). But Ground One is procedurally defaulted because it was "not presented to the state courts 'consistent with [the state's] own procedural rules'" requiring the claim to be brought on direct appeal. *Id.* (quoting *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)). Hurst does not show that an exception overcomes the default. *See id.* Accordingly, Ground One is barred from federal habeas review.

Even if not procedurally defaulted, the claim fails on the merits. "A jury instruction that was allegedly incorrect under state law is not a basis for habeas relief, because federal habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Jamerson v. Sec'y for Dep't of Corr.*, 410 F.3d 682, 688 (11th Cir. 2005). "[F]ederal courts on habeas review are constrained to determine only whether the challenged instruction, viewed in the context of both the entire charge and the trial record, so infected the entire trial that the resulting conviction violate[d] due process." *Id.* Relief is not warranted unless the instruction "had a substantial influence on the jury's verdict of guilty." *Land v. Allen*, 573 F.3d 1211, 1219 (11th Cir. 2009).

First, contrary to Hurst's assertion, the trial court gave the standard instructions on (1) the elements of first-degree murder, (2) justifiable and excusable homicide, (3) the definition of premeditation, (4) the credibility of Hurst's out-of-court statements, and (5) the credibility of witnesses. (*Compare* Doc. 9-2, Ex. 34, at 698–708, *with* Fla. Std. Jury Instr. (Crim.) 3.9, 3.9(b), 7.1, 7.2.) Hurst fails to explain how these standard instructions were deficient, and he offers no basis to conclude

that they misstated any aspect of Florida law. Thus, he cannot establish that the challenged instructions "so infected the entire trial that the resulting conviction violate[d] due process." *Jamerson*, 410 F.3d at 688; *see also Destine v. McDonough*, No. 06-61568-CIV, 2008 WL 4792364, at *8 (S.D. Fla. Oct. 31, 2008) (petitioner "state[d] no basis for federal relief" "where the jury received the standard instruction on the voluntariness of a confession that was approved by the Florida Supreme Court").

Second, Hurst is correct that the instruction on voluntary intoxication was incorrect, but that error does not entitle him to relief. The court told the jury that "[v]oluntary intoxication resulting from the consumption, injection[,] or other use of alcohol or other controlled substances is not a defense to a crime." (Doc. 9-2, Ex. 34, at 701.) Florida "abolished the voluntary intoxication defense for offenses committed after July 1, 1999." *Montero v. State*, 996 So. 2d 888, 890 (Fla. 4th DCA 2008). But Hurst committed his crime in 1982, which means that "voluntary intoxication was an available defense . . . at the time of the killing in this case." *Pooler v. State*, 980 So. 2d 460, 464 n.3 (Fla. 2008); *see also McCann v. State*, 854 So. 2d 788, 791 n.1 (Fla. 2d DCA 2003) (noting that the "statute [abolishing the voluntary intoxication defense] was not in effect at the time of the subject crimes and [was therefore] not applicable in this case").

The problem for Hurst is that nothing in the trial record supported a defense of voluntary intoxication. "[T]o assert a voluntary intoxication defense, a defendant must present evidence of intoxication *at the time of the offense* that would establish the defendant's inability to form the requisite specific intent." *Jones v. State*, 855 So. 2d 611, 617 (Fla. 2003) (emphasis in original). There was no evidence

at trial that Hurst was intoxicated at the time of the murder. Thus, he was not entitled to an instruction on voluntary intoxication. *See Calvert v. State*, 730 So. 2d 316, 320 (Fla. 5th DCA 1999) ("A voluntary intoxication instruction is only required where the defendant produces evidence of his intoxication sufficient to establish that he was incapable of forming the intent necessary to commit the crime."). And because the trial record lacked any evidence that Hurst was intoxicated when he killed his wife, he cannot show that the erroneous instruction "so infected the entire trial that the resulting conviction violate[d] due process." *Jamerson*, 410 F.3d at 688; *see also Flores v. Long*, 563 F. App'x 559, 560 (9th Cir. 2014) (because "there was no evidence [that petitioner] committed the crimes under duress," "[o]mission of a duress instruction could [] not have so infected the entire trial that the resulting conviction violates due process").

### B. Grounds Two and Four—Failure to Pursue Voluntary Intoxication Defense

Hurst contends that trial counsel was ineffective for failing to pursue a voluntary intoxication defense. (Doc. 1 at 8.) He alleges that, on the night of the murder, he and the victim went to a bar at 6:00 p.m., "remained there until the bar closed," and then "proceed[ed] to [a] 'bottle club'" before "finally arriving home [at] approximately 4:30 a.m." (*Id.*) According to Hurst, his consumption of alcohol that night made him "unable to form the specific intent" necessary to commit "premeditated murder." (Doc. 14 at 5.) Hurst further alleges that counsel should have investigated the possibility that Theresa Allen, his sister, could testify at trial about his alcohol consumption before he moved to Florida with the victim. (Doc. 1 at 12–13; *see also* Doc. 9-2, Ex. 60, at 11.)

14

The postconviction court held an evidentiary hearing on this claim. (Doc. 9-2, Ex. 70.) It heard testimony from the two attorneys who represented Hurst at trial—Dean Livermore and William Pura. Livermore stated that he and Hurst discussed the latter's "alcohol use," but that he chose not to "pursue" a voluntary intoxication defense because "there were too many problems with it." (*Id.* at 38–39.) Livermore explained that there were no "witnesses" other than Hurst himself who could testify that he was intoxicated at the time of the murder. (*Id.* at 40.) Moreover, a voluntary intoxication defense was "inconsistent" with Hurst's statements to "law enforcement" and "other witnesses" that "the death was an accident." (*Id.* at 45–46.) Specifically, Hurst claimed that the victim "went to [hit] him[,] fell[,] and hit her head," and that he never "touched her in any way." (*Id.*) That defense, in Livermore's view, did not "fit with voluntary intoxication." (*Id.* at 41.) Pura likewise stated that counsel did not pursue a voluntary intoxication defense because it "would have competed with the accident theory of defense." (*Id.* at 56.)

Hurst testified at the hearing as well. He claimed that, on the night in question, he and the victim "had been drinking since about 6:00 [p.m.] and it was approximately between four and five [in the morning] by the time [they] got home." (*Id.* at 22.) He agreed that he was not "thinking clearly" at the time, and that he was "at the point of possibly blacking out." (*Id.* at 27.) On cross-examination, Hurst initially stated that he "didn't hit [the victim] and that she [fell] and hit her head." (*Id.* at 28.) The prosecution pointed out that a voluntary intoxication defense "requires you to say that, yes, I did this, but I'm not responsible for my actions because [of my intoxicated state]." (*Id.* at 29.) Hurst then

changed his story, claiming that he "pull[ed] [the victim's] leg" before she fell. (*Id.* at 29–30.)

As for Theresa Allen (Hurst's sister), she did not testify at the hearing. (*Id.* at 8; *see also id.*, Ex. 71, at 6–7.) Instead, Hurst submitted an affidavit from Allen in which she stated that she knew the victim from August 1976 until the summer of 1980. (*Id.*, Ex. 73.) According to the affidavit, Hurst and the victim "seemed very much in love and happy together," although "they would argue when they both were drinking a lot." (*Id.*) Allen said that she tried to contact Hurst's counsel "several times before [the trial] with no results." (*Id.*)

Following the hearing, the court rejected Hurst's ineffective assistance claim. (*Id.*, Ex. 75, at 3–13.) It held that counsel "made a strategic, and reasonable, decision not to pursue" a voluntary intoxication defense. (*Id.* at 8.) First, counsel testified that "there was no one to corroborate [Hurst's] claim about being intoxicated" on the night of the murder. (*Id.* at 7.) And while Hurst faulted counsel for failing to investigate Theresa Allen, she was "not even present when the offense occurred, much less present on the day of the offense." (*Id.* at 12.) Second, "both attorneys testified that they viewed the voluntary intoxication defense as inconsistent with, and contradictory to, [Hurst's] claim that the victim's death was an accident." (*Id.* at 8.) In these circumstances, the court held, counsel made a "reasonable" decision to eschew a voluntary intoxication defense. (*Id.*)

The postconviction court correctly rejected this claim. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A strategic choice "will be held to have been ineffective assistance only if it was so patently unreasonable

that no competent attorney would have chosen it." *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). "Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020). Therefore, to prevail on his ineffective assistance claim, Hurst must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Id.*

Hurst cannot make this demanding showing. A reasonable jurist could conclude that counsel acted "within the wide range of reasonable professional conduct" when they declined to pursue a voluntary intoxication defense. *Id.* As noted above, "to assert a voluntary intoxication defense, a defendant must present evidence of intoxication *at the time of the offense* that would establish the defendant's inability to form the requisite specific intent." *Jones*, 855 So. 2d at 617 (emphasis in original). As the postconviction court explained, no witness could corroborate Hurst's self-serving assertion that he was intoxicated at the time of the murder. Counsel was not deficient for failing to pursue an uncorroborated defense of voluntary intoxication. *See Reaves v. State*, 942 So. 2d 874, 879 (Fla. 2006) (counsel not ineffective for failing to pursue voluntary intoxication defense because, among other things, "[t]here was no evidence to corroborate [petitioner's] assertions that he was 'high' at the time of the offense").

Moreover, counsel reasonably decided to forgo a voluntary intoxication defense because it would be inconsistent with Hurst's claim that the death was an accident. Voluntary intoxication "is an affirmative defense." *Dufour v. State*, 905

17

So. 2d 42, 52 (Fla. 2005). It "provides a defendant with an opportunity to explain why his or her admittedly illegal conduct should not be punished." *State v. Adkins*, 96 So. 3d 412, 423 (Fla. 2012). At trial, however, Hurst did not admit that he killed the victim. Instead, the jury heard him tell Candis Spinks that the death was an accident. Specifically, he said that the victim was lying on a couch, "got pissed off," and stood up to "kick[]" him. (Doc. 9-2, Ex. 34, at 595.) At that point, Hurst explained, the victim "missed" and fell, "bust[ing] her head open." (*Id.*) So Hurst "maintained his innocence, a defense inconsistent with an intoxication defense." *Jones v. State*, 855 So. 2d 611, 616–17 (Fla. 2003). Counsel's "decision not to present an intoxication defense was reasonable in light of the factual innocence defense" presented at trial. *Nelson v. Nagle*, 995 F.2d 1549, 1554 (11th Cir. 1993).

For all these reasons, the postconviction court reasonably concluded that counsel did not provide ineffective assistance by forgoing a voluntary intoxication defense.

### C. Ground Three—Denial of Motion to Exclude *Williams* Rule Evidence

Hurst contends that the trial court violated his constitutional right to a fair trial by denying his motion to exclude *Williams* rule evidence. (Doc. 1 at 9–10.) "*Williams* rule evidence is evidence of other conduct, which . . . is similar to the charged offense and is relevant to prove a material fact in issue, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Thompson v. State*, 76 So. 3d 1050, 1053 (Fla. 1st DCA 2011). Here, the prosecution sought to admit "evidence of [] violent acts and threats made by [Hurst] toward the victim prior to her death." (Doc. 9-2, Ex. 17, at 1.) The prosecution maintained that this evidence "rebut[ted]" the "anticipated defense"

that the death was an "accident." (*Id.*, Ex. 15, at 41–42.) Hurst objected, and the court held an evidentiary hearing. (*Id.*, Exs. 15, 16.)

At the hearing, the prosecution asked Jeffrey Earley (the victim's son) whether he had ever heard Hurst "threaten to kill [his] mother." (*Id.*, Ex. 15, at 18.) Earley answered, "No." (*Id.* at 19.) After the hearing, the court issued a written order denying the request to exclude the *Williams* rule evidence. (*Id.*, Ex. 17.) In the order, the court mistakenly stated that Earley "recall[ed] [Hurst] threaten[ing] to kill the victim." (*Id.* at 2.) The court also discussed Earley's testimony about the physical abuse Hurst inflicted on the victim during their marriage. (*Id.* at 1–2.) And it cited testimony from the victim's niece about an incident in which Hurst "backhand[ed] the victim as she sat in the passenger seat in the car with [him]." (*Id.* at 2.) Ultimately, the court concluded that "[t]he prior abusive history between [Hurst] and the victim [was] relevant . . . to show motive, intent, and absence of mistake or accident." (*Id.* at 7.)

Hurst now contends that the trial court violated his federal right to a fair trial by admitting the *Williams* rule evidence based on a "misunderstanding of [Earley's] testimony." (Doc. 1 at 9.) As Respondent correctly points out, this claim is procedurally defaulted because Hurst did not challenge the admission of any *Williams* rule evidence on direct appeal. (Doc. 9-2, Ex. 42.) Hurst cannot return to state court to present the claim in a second direct appeal. *See* Fla. R. App. P. 9.140(b)(3). Ground Three is thus technically exhausted—and procedurally defaulted—because it was "not presented to the state courts 'consistent with [the state's] own procedural rules'" and Hurst no longer has any state remedies available to him. *Shinn*, 142 S. Ct. at 1732.

19

Hurst does not expressly argue that an exception overcomes the default. His petition could, however, be liberally construed as asserting that appellate counsel was deficient for failing to raise Ground Three on direct appeal. (Doc. 1 at 11.) Even assuming that this argument is properly preserved, it is insufficient to excuse the default. "A showing of ineffective assistance of appellate counsel in failing to raise a claim on direct appeal can constitute 'cause' so long as the ineffective assistance occur[red] during a stage when a petitioner had a constitutional right to counsel, *and the ineffective assistance claim itself is both exhausted and not procedurally defaulted*." *Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1365 (11th Cir. 2020) (emphasis added). Proper exhaustion requires a petitioner to "present [his] claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation." *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004).

Hurst argued in state court that appellate counsel was "negligent" for failing to challenge the trial court's "obvious error" concerning Earley's testimony. (Doc. 9-2, Ex. 50, at 8.) But Hurst did not contend that appellate counsel should have raised the claim he seeks to press here—namely, that the trial court violated his *federal right to a fair trial* by admitting *Williams* rule evidence based on a misunderstanding of Earley's testimony. (*Id.* at 5–9.) In other words, Hurst failed to present the state court with the "particular legal basis" of his ineffective assistance claim. *Kelley*, 377 F.3d at 1345. This means the state court never had an opportunity to decide whether appellate counsel was deficient for not raising Ground Three on direct appeal. Thus, Hurst's claim of ineffective assistance is itself procedurally defaulted, and it cannot excuse the default of Ground Three.

*See Andrews v. Sec'y, Fla. Dep't of Corr.*, No. 3:15-cv-1262-TJC-PDB, 2018 WL 5829971, at *5 (M.D. Fla. Nov. 7, 2018) (no cause to excuse default where petitioner "filed a petition challenging his appellate attorney's failure to argue [the sufficiency of the circumstantial evidence]," but "never challenged his appellate counsel's failure to raise a federal constitutional claim regarding the sufficiency of circumstantial evidence.").[2]

### D. Ground Five—Failure to Raise *Giglio* Claim

Hurst argues that trial counsel provided ineffective assistance by failing to raise an alleged *Giglio*[3] violation. (Doc. 1 at 15.) As noted above, Earley (the victim's son) testified at the *Williams* rule hearing that Hurst never threatened to kill his mother. (Doc. 9-2, Ex. 15, at 18–19.) The trial court subsequently ruled that the *Williams* rule evidence was admissible. (*Id.*, Ex. 17.) In doing so, the court mistakenly stated that Earley "recall[ed] [Hurst] threaten[ing] to kill the victim." (*Id.* at 2.) During a subsequent hearing—presided over by a different judge—Hurst pointed out the mistake and renewed his objection to the *Williams* rule evidence. (*Id.*, Ex. 27, at 6–7.) The court overruled the objection without explanation. (*Id.* at 7.)

At trial, Earley testified that Hurst had threatened to kill the victim. (*Id.*, Ex. 34, at 448.) On cross-examination, however, Earley was impeached with his

---

[2] Even if Ground Three were not procedurally defaulted, it would fail on the merits. Courts "will not grant federal habeas corpus relief based on an evidentiary ruling unless the ruling affects the fundamental fairness of the trial." *Mills v. Singletary*, 161 F.3d 1273, 1289 (11th Cir. 1998). "A denial of fundamental fairness occurs whenever the improper evidence is material in the sense of a crucial, critical, highly significant factor." *Id.* As explained below in the discussion of Ground Five, even without Hurst's alleged threat to kill the victim, the prosecution presented overwhelming evidence of his guilt. A petitioner "is not deprived of a fundamentally fair trial" where, as here, "the other evidence of guilt is overwhelming." *Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991).

[3] *Giglio v. United States*, 405 U.S. 150 (1972).

testimony from the *Williams* rule hearing—that is, his statement that he had never heard Hurst make such a threat. (*Id.* at 452.) Indeed, Earley acknowledged that he was now "saying the opposite" of what he had testified to during the pretrial hearing. (*Id.*) The prosecution tried to rehabilitate Earley on redirect examination. It presented him with a copy of the *Williams* rule order and asked whether he had "reviewed another document which had a different observation about what you said at that hearing." (*Id.* at 457.) Earley answered, "Yes." (*Id.*) He then agreed that the *Williams* rule order was "consistent with what [he was] telling the jury"— namely, that Hurst had threatened to kill his mother. (*Id.*)

Hurst now contends that counsel should have raised a *Giglio* claim based on Earley's testimony at trial that Hurst had threatened to kill the victim. (Doc. 1 at 15.) According to Hurst, the prosecutor violated *Giglio* by eliciting this allegedly false testimony, and counsel rendered ineffective assistance by failing to raise the *Giglio* claim. (*Id.*)

Hurst brought this ineffective assistance claim in his Rule 3.850 motion, but the postconviction court failed to address it. (Doc. 9-2, Ex. 60, at 14–16; Doc. 9-2, Ex. 75, at 17–22.) Instead, the court mistakenly interpreted the Rule 3.850 motion as raising a freestanding *Giglio* claim. (*Id.*, Ex. 75, at 17.) It then found that, because "the testimony at issue" was not "material," Hurst failed to establish a *Giglio* violation. (*Id.* at 17–22.) The appellate court subsequently affirmed the denial of relief in an unexplained decision. (*Id.*, Ex. 82.)

Typically, a "federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson*, 584

22

U.S. at 125. But the "look through" presumption does not apply where an "unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state [appellate] court or obvious in the record it reviewed." *Id.* at 125–26. And "the unreasonableness of the lower court's decision itself provides some evidence that makes it less likely the state [appellate] court adopted the same reasoning." *Id.* at 132.

The "look through" presumption does not apply here because the appellate court "most likely" relied on "alternative grounds for affirmance." *Id.* at 126. In its appellate brief, the prosecution conceded that the postconviction court had misinterpreted Hurst's claim. (Doc. 9-2, Ex. 80, at 43 n.7.) It pointed out that the postconviction court "appear[ed] to have interpreted [Hurst's] Rule 3.850 motion as raising a claim under *Giglio*." (*Id.*) In fact, "[Hurst's] argument was that his counsel was ineffective under *Strickland* for failing to raise a *Giglio* claim at trial." (*Id.*) The prosecution nonetheless urged the appellate court to affirm on the alternative ground that "counsel was not deficient, and [Hurst] was not prejudiced, by his counsel's failure to raise a *Giglio* [claim]" because any such claim lacked merit. (*Id.* at 45.)

The prosecution argued that the *Giglio* claim failed for two reasons. First, "there [was] no evidence to support a finding that Earley's testimony was false, or that the prosecutor knew it was false." (*Id.* at 44.) Instead, "[t]he record showed only that Earley initially answered in the negative when he was asked at the *Williams* rule hearing if he ever heard [Hurst] threaten to kill his mother, but that he later testified differently at trial." (*Id.*) The prosecution explained that, "[f]or

purposes of *Giglio*, 'inconsistent testimony does not equate to false testimony.'" (*Id.* (quoting *Thompson v. State*, 273 So. 3d 1069, 1076 (Fla. 1st DCA 2019)).)

Second, Earley's testimony was not "material"—that is, there was no "reasonable possibility that [it] could have affected the jury's verdict." (*Id.* at 45 (citation omitted).) The prosecution pointed out that "counsel in fact impeached Earley's testimony that he heard [Hurst] threaten to kill his mother." (*Id.*) This meant "the jury was made aware that Earley previously gave contradictory testimony on that point." (*Id.*) And "even without that testimony," the jury still heard (1) "Earley's testimony regarding [Hurst's] prior abuse of the victim," (2) Hurst's "statements admitting that he disposed of the victim's body," and (3) the medical evidence showing "multiple blunt force impacts to the victim's head," which "rebutt[ed] [Hurst's] defense that the victim's death occurred accidentally when she tried to kick him but instead tripped and fell." (*Id.*)

I find that the appellate court's unexplained decision "most likely" relied on these "alternative grounds for affirmance." *Wilson*, 584 U.S. at 126. That conclusion is bolstered by "the unreasonableness of the lower court's decision," which entirely overlooked Hurst's ineffective assistance claim. *Id.* at 132. The question thus becomes whether—in the light of the alternative grounds for affirmance—the appellate court reasonably applied federal law when it rejected the ineffective assistance claim. The answer to that question is yes.

"To establish a *Giglio* claim, a habeas petitioner must prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, *i.e.*, that there is any reasonable likelihood that the false testimony could . . . have affected

the judgment." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011). "[T]he suggestion that a statement may have been false is simply insufficient [to establish a *Giglio* violation]; the defendant must conclusively show that the statement was actually false." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1313 (11th Cir. 2005). "[A] prior statement that is merely inconsistent with a government witness's testimony is insufficient to establish" that the government knowingly used false testimony. *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010); *see also Hays v. State of Alabama*, 85 F.3d 1492, 1499 (11th Cir. 1996) (finding no due process violation where "there ha[d] been no showing that [the witness's] later, rather than earlier, testimony was false").

Hurst's *Giglio* claim lacks merit, and "[a] lawyer cannot be deficient for failing to raise a meritless claim." *Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008). The *Giglio* claim rests entirely on the inconsistency between (1) Earley's testimony at the *Williams* rule hearing (where he denied that Hurst had threatened to kill his mother), and (2) his testimony at trial (where he claimed that Hurst had in fact threatened to kill his mother). (Doc. 1 at 15.) But "a prior statement that is merely inconsistent with a government witness's testimony is insufficient to establish" a *Giglio* violation. *McNair*, 605 F.3d at 1208. And Hurst makes "no showing that [Earley's] later, rather than earlier, testimony was false." *Hays*, 85 F.3d at 1499. Thus, Hurst fails to "conclusively show that [Earley's trial testimony] was actually false," as is required to establish a *Giglio* violation. *Maharaj*, 432 F.3d at 1313; *see also Sicola v. Dep't of Corr.*, No. 8:18-cv-486-KKM-TGW, 2021 WL 9528089, at *5 (M.D. Fla. May 14, 2021) ("The mere fact that the brother's trial

testimony was inconsistent with his previous deposition testimony does not establish that his trial testimony was false.").

Even if Earley's trial testimony were false, the *Giglio* claim would still fail for lack of materiality. To establish materiality, a petitioner must show "a reasonable likelihood that the false testimony could have affected the judgment." *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1108 (11th Cir. 2012). Courts must "consider the cumulative effect of the false evidence for the purposes of materiality." *Guzman*, 663 F.3d at 1351. This "means adding up the force of [the false testimony] and weighing it against the totality of the evidence that was introduced at the trial." *Id.* (emphasis omitted).

Hurst cannot establish "a reasonable likelihood that [Earley's allegedly] false testimony could have affected the judgment." *Trepal*, 684 F.3d at 1108. As an initial matter, Earley "was thoroughly and vigorously cross-examined about the inconsistenc[y] in his accounts." *Maharaj*, 432 F.3d at 1314 (finding that state court reasonably rejected *Giglio* claim for lack of materiality). The jury heard Earley testify that Hurst had threatened to kill the victim. (Doc. 9-2, Ex. 34, at 448.) But the jury also learned on cross-examination that Earley had previously stated that Hurst made no such threat. (*Id.* at 452.) "[B]ecause the jury was made aware of the inconsistency, the 'false' testimony could not [have] affect[ed] the judgment of the jury." *Tejada v. Dugger*, 941 F.2d 1551, 1557 (11th Cir. 1991); *see also United States v. Bueno-Sierra*, 99 F.3d 375, 380 (11th Cir. 1996) (no materiality where "[d]efense counsel fully explored every inconsistency alleged by the appellants").

Even without Hurst's alleged threat to kill the victim, the prosecution presented overwhelming evidence of his guilt. *See Ventura v. Att'y Gen., Fla.*, 419

F.3d 1269, 1281 (11th Cir. 2005) (*Giglio* materiality depends on, among other things, "the importance of the testimony of the falsely testifying witness to the government's case"). Hurst admitted to Elmer Kruse that he "got rid of the body"; he also said he "made sure" there were "no eyewitnesses." (Doc. 9-2, Ex. 34, at 523, 543.) True, Hurst claimed the death was an accident. (*Id.* at 595.) But that assertion was refuted by uncontradicted medical evidence showing that the victim suffered three blunt force injuries to the top, back, and left side of her head. (*Id.* at 496.) Indeed, the medical examiner testified that these injuries could not have resulted from "someone fall[ing] and hit[ting] their head," and that there was no evidence the death was "accidental." (*Id.* at 497, 501.) Finally, the jury learned that Hurst was physically abusive toward the victim, hitting her in the head with an iron skillet, throwing her down a flight of stairs, and "backhand[ing]" her in the face so hard she bled. (*Id.* at 444–47.) Given "the totality of the evidence that was introduced at trial," there is no reasonable likelihood that the allegedly false testimony could have affected the verdict. *Guzman*, 663 F.3d at 1351.

For all these reasons, counsel was not deficient for failing to raise Hurst's meritless *Giglio* claim. Thus, the appellate court reasonably rejected his claim of ineffective assistance.

### E. Ground Six—Alleged Confrontation Clause Violation

Hurst contends that the trial court violated the Confrontation Clause by forbidding him from cross-examining Candis Spinks about a criminal charge that was pending against her when she cooperated with law enforcement. (Doc. 1 at 16.) As noted above, Spinks was a friend of Hurst's who agreed to wear a recording device while she spoke to him. (Doc. 9-2, Ex. 34, at 528.) Three days before agreeing

to cooperate with law enforcement, Spinks had pled guilty in Kentucky state court to trafficking in morphine. (*Id.*, Ex. 32, at 458.) Later that year, she was sentenced to ten years in prison. (*Id.*) The sentencing took place less than a week after Spinks "gave a sworn statement to the State Attorney" in Hurst's case. (*Id.*)

Before trial, Hurst moved for permission to cross-examine Spinks "on the pending charge at the time of her cooperation with law enforcement." (*Id.* at 459.) He argued that "[t]his evidence [was] critical to establish her bias, motive, and interest in regard to her testimony." (*Id.*) The trial court denied the request without explanation. (*Id.*, Ex. 34, at 280.) At trial, however, the jury did learn that Spinks had previously been convicted of at least two felonies. (*Id.* at 609.)

On direct appeal, Hurst argued that the trial court violated the Confrontation Clause by prohibiting him from asking Spinks about the pending charge. (*Id.*, Ex. 42, at 19–22.) The appellate court rejected this claim without explanation. (*Id.*, Ex. 45.) In his federal habeas petition, Hurst renews his Confrontation Clause claim, arguing that he had a constitutional right to impeach Spinks with the charge pending against her when she cooperated with law enforcement. (Doc. 1 at 16.)

I assume, without deciding, that the trial court's limitation on cross-examination violated the Confrontation Clause. Even with that assumption, Hurst is not entitled to relief because he cannot show "actual prejudice" under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

The Confrontation Clause requires "a full and fair opportunity to probe and expose . . . infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness's testimony."

*Delaware v. Fensterer*, 474 U.S. 15, 22 (1985). "A court violates the Confrontation Clause when it inappropriately restricts the scope of cross-examination." *Al-Amin v. Warden Georgia Dep't of Corr.*, 932 F.3d 1291, 1302 (11th Cir. 2019). But a Confrontation Clause violation does not necessarily require a federal habeas court to grant relief. "On federal collateral review, . . . [courts] review an alleged Confrontation Clause error under *Brecht*'s actual prejudice standard." *Id.* "To show prejudice under *Brecht*, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." *Trepal*, 684 F.3d at 1114. "Whether [a Confrontation Clause] error was harmless may depend on, among other things, the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Al-Amin*, 932 F.3d at 1302.

Any Confrontation Clause error here was harmless. Hurst contends that the pending charge gave Spinks a "motive" to provide "biased testimony favorable to the [s]tate." (Doc. 1 at 16; Doc. 9-2, Ex. 32, at 459–60.) But Spinks's importance as a witness lay primarily in her recorded conversation with Hurst. (Doc. 9-2, Ex. 34, at 578–605.) During that conversation, Hurst told Spinks the death was an accident that resulted from the victim's attempt to "kick[]" him. (*Id.* at 595.) The recording was introduced at trial through Spinks, but Hurst has never disputed its authenticity, nor has he argued that the voice on the recording does not belong to him. Thus, any evidence that undermined Spinks's credibility would be unlikely to affect the jury's assessment of the statements Hurst made during the recorded

conversation. *See Garnett v. Morgan*, 462 F. App'x 706, 708 (9th Cir. 2011) (impeachment evidence not material because "[t]he evidentiary value of the recorded conversations [between the defendant and the witness] . . . did not depend on [the witness's] credibility").

Moreover, even without these statements, the "evidence of [Hurst's] guilt is overwhelming." *Guzman*, 663 F.3d at 1355. The jury learned, among other things, that (1) Hurst admitted to Elmer Kruse that he "got rid of the body" and "made sure" there were "no eyewitnesses"; (2) unrebutted medical evidence showed that the victim suffered three blunt force injuries to the top, back, and left side of her head; (3) those injuries were inconsistent with Hurst's assertion that the death was an accident; and (4) Hurst was physically abusive toward the victim during their marriage. (Doc. 9-2, Ex. 34, at 444–47, 496–97, 501, 523, 543.) In the light of the substantial evidence of Hurst's guilt, any Confrontation Clause error was harmless. *See Hull v. Sec'y, Fla. Dep't of Corr.*, 572 F. App'x 697, 701 (11th Cir. 2014) (under *Brecht*, "[e]rrors are harmless if there is significant corroborating evidence or the state's evidence of guilt is overwhelming").

### F. Ground Seven—Failure to Investigate Statute of Limitations Defense

Lastly, Hurst contends that trial counsel provided ineffective assistance by failing to pursue an alleged statute of limitations defense. (Doc. 1 at 17.) Hurst was charged with first-degree murder, which has no statute of limitations under Florida law. *See Weber v. State*, 602 So. 2d 1316, 1317 (Fla. 5th DCA 1992) ("[T]here is no statute of limitations for first-degree murder."). Hurst argues, however, that counsel should have sought jury instructions on unspecified "lesser included

offenses" for which the statute of limitations had run. (Doc. 1 at 17; *see also* Doc. 9-2, Ex. 86, at 6–9.)

Respondent correctly contends that this claim is procedurally defaulted. (Doc. 9 at 53.) Hurst raised Ground Seven in a successive Rule 3.850 motion. (Doc. 9-2, Ex. 86, at 6–9.) The postconviction court rejected the claim on procedural grounds, holding that it "could have been pursued through [Hurst's] previous amended motion to vacate, set aside, or correct sentence." (*Id.* at 7.) Because "the procedural requirements of Florida's Rule 3.850 constitute independent and adequate state grounds," Ground Seven is procedurally defaulted. *LeCroy v. Sec'y, Fla. Dep't Corr.*, 421 F.3d 1237, 1260 n.25 (11th Cir. 2005). Hurst makes no attempt to overcome the default. Thus, Ground Seven is barred from federal habeas review.

## V.   <u>CERTIFICATE OF APPEALABILITY</u>

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Hurst must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Hurst has not made the requisite showing. Finally, because Hurst is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Hurst's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Hurst and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on November 26, 2024.

Kathryn Kimball Mizelle
United States District Judge